## THE CONNECTICUT.[1]

### BOYER v. THE CONNECTICUT.

*(District Court, E. D. New York. January 21, 1891.)*

MARITIME TORTS—DAMAGE FROM STEAMER'S SWELL—EVIDENCE.

On the 26th of June, 1889, libelant's lighter, while lying at a pier at the foot of South Third street, in the East river, loaded with sugar, was upset, and her cargo lost, and this suit was in consequence brought against the steam-boat Connecticut, libelant alleging that by the latter's negligent navigation, in passing too near the piers, at a high rate of speed, she created a swell, which caused the accident. The main defense was that the swell which did the damage sued for was not made by the Connecticut. On the evidence it was *held,* that the careening of the lighter was caused by an extraordinary and dangerous swell made by the passing of the Connecticut too near the piers, at high speed, and that that vessel was in consequence liable for the damage.

In Admiralty. Suit for damage caused by the upsetting of the lighter Vigil.

*Carpenter & Mosher* and *R. D. Benedict,* for the libelant.

*Miller, Peckham & Dixon,* for the Connecticut.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

BENEDICT, J.    This is an action to recover of the steam-boat Connecticut damages resulting from the careening, on the 26th of June, 1889, of the lighter Vigil, lying outside the steamer Sardonian, at the lower side of South Third street pier, in the East river, loaded with sugar, whereby the deck-load of the lighter was thrown into the water, causing a loss of some $20,000.    The libelant charges his loss to negligent navigation of the steam-boat Connecticut, in that she passed too near to the pier, and at an improper rate of speed, and thereby created an extraordinary and dangerous swell, which caused this lighter to dump her deck-load. The answer sets up various grounds of defense, some of which, involving little difficulty, will be first disposed of.    Among other things the answer alleges that the place where the lighter lay was exposed and dangerous.    But the evidence shows that the lighter lay at a place where lighters with similar cargoes had for many years lain without receiving any damage from the swell of the Sound boats, which pass the place twice a day.    The answer further alleges that the lighter was insufficiently fastened along-side the steamer Sardonian; but it is proved without contradiction that she was well fastened by new lines.    It is further charged that the lighter was negligent in having no one on board of her on watch.    But the proof is that the mate was on board, and duly attentive.    The answer further alleges that the lighter was overloaded. But the proof is that this lighter had carried heavier loads before; that she had been loaded to the draft of 13 feet of water with safety; and that on this occasion she was drawing only 12 feet.    It is also charged that the cargo of the lighter was not properly stowed, and that she had a greater load upon deck than was safe.    The proof shows that she was ballasted with about 25 tons of stone ballast; that her hold was filled with packages of the heaviest part of her cargo; that the deck-load was stowed in the usual and customary way; that she had taken this very cargo on board at Union stores, near Hamilton ferry, and been towed thence to South Third street in safety; and that she had lain with that load aboard at South Third street pier from the morning of the 25th of June to the afternoon of the 26th of June, during which time the Sound boats had passed up and down twice, without doing any damage or causing apprehension to those in charge of the lighter.    The state of the proofs has not permitted much stress to be laid upon any of these defenses.    The main ground of defense is that the swell which did the damage sued for was not caused by the Connecticut, and over this defense the controversy is severe.    In disposing of the question, which appears to me also to be the decisive question in this case, namely, whether the swell which caused the damage in question was caused by the steamer Connecticut, I notice at the outset the following facts:    The swell that careened the libelant's lighter was caused by one of the two large Sound steam-boats which passed through the East river on the afternoon of June 26th.    No other vessel capable of producing such a swell was in the locality at the time of the accident.    On the afternoon of that day the Connecticut was delayed at her pier, so that she was the last of the Sound boats to pass through the East river.    The accident occurred

after, and almost immediately after, the Connecticut passed the pier where the lighter lay along-side the steamer Sardonian. On this afternoon the Providence, contrary to the usual order which the Sound boats follow, passed through the East river next ahead of the Connecticut.

In addition to these facts, it is important to consider another fact proved in behalf of the Connecticut by witnesses who made personal observations, watch in hand, namely, that swells caused by the Sound boats when passing South Third street on the flood tide reach that pier in from one minute to one minute and eighteen seconds after the stern of the boat causing the swell passes the pier. This fact I recognize as of the utmost importance, for it seems to me to make futile the contention that has been made in behalf of the Connecticut, that the swell complained of was made, not by the Connecticut, but by the Providence; for not only is it proved by some eight witnesses who saw the accident that the Connecticut, at the time the swell came in, had just passed the pier at which the lighter lay, but there is in the case conclusive evidence to show that the Providence, when the Connecticut passed this pier, was so far ahead of the Connecticut that the swell of the Providence must have reached the pier, and been wholly spent before the Connecticut arrived. For many witnesses who saw the accident say that the Providence had passed this pier 20 minutes before the swell came in, and in order to have been the cause of this swell the Providence must have been, at the time of the accident, not to exceed 2,500 feet above the pier, where no witnesses in behalf of the Connecticut put her. At that time the great weight of evidence is that the Providence was much more than two minutes' run ahead of the Connecticut, and unless the Providence was within that distance of the Connecticut, according to the evidence of the claimants, above alluded to, the swell that caused the accident could not have been caused by the Providence. Indeed, taking into consideration the elements of time, distance and speed, as given in the testimony, I think the conclusion necessarily follows that at the time of the accident the Providence was as far above South Third street pier as Bushwick inlet, and that the swell that caused the lighter to careen was no swell of hers. Moreover, there is in the testimony of the witnesses called by the libelant a mass of direct evidence to the effect that at the time of the accident the Connecticut passed South Third street, at a high speed, close by the piers, and caused the swell that careened the lighter. These witnesses (some from the Sardonian, some from the shore) seem honest and intelligent, and five of them are wholly disinterested. They saw the Connecticut pass, and they saw that an extraordinary swell followed her passing, and they saw its effect upon the lighter. Nor is it improbable that the Connecticut should have passed as these witnesses say she did on this occasion. The record shows more than one instance of a Sound boat passing close to the piers in this locality, and a reason for so doing is found in the fact that on a flood tide a boat keeping close to the Brooklyn shore in this locality derives more advantage from the tide. Moreover, on this day the Connecticut had been delayed at her pier, so that she was behind instead

of ahead of the Providence, her usual place, and she may, without much difficulty, be supposed to have been desirous to make up lost time. Furthermore, the log of the Connecticut shows that on this afternoon she actually made the distance from her pier in the East river to Hell Gate in fast time. Her log shows that on this afternoon she ran to Hell Gate in 30 minutes. On only one other trip, according to the log, did she make this distance in so short a time, and that was a westward trip, on July 18th, when she also made it in 30 minutes. The testimony given by numerous witnesses who saw the accident, coupled with the facts already alluded to, afford, as it seems to me, convincing proof that the cause of the swell complained of was the passing of the Connecticut close to the piers at high speed.

As against these considerations, and the testimony that has been alluded to, the claimants produce the master, pilots, and wheelsmen of the Connecticut, who testified that on the afternoon of June 26th the Connecticut, when she passed South Third street, was on the New York side of the channel; that she was under a slow bell from the time of passing Grand-Street ferry until she passed South Third street pier; that she stopped below Grand street, and it was not possible, therefore, for her to have been at full speed when she passed South Third street, as she could not regain her full speed in that distance. This testimony is in direct opposition to the testimony of the libelant's witnesses, who say they saw the Connecticut pass close to the Brooklyn side, and at high speed. One way in which to reconcile these conflicting statements is to suppose that the master and crew of the Connecticut have mistaken the trip, and speak of what occurred on some trip other than that of June 26th. Such a supposition is easily maintainable from the fact that the Connecticut made daily trips through the East river; that the accident to the Vigil was unknown to any one on board the Connecticut until some days, and probably a week or more, after it happened; and that such occurrences as the witnesses from the Connecticut speak of are likely to occur on any day. Under such circumstances the confounding of one trip with another is entirely possible. It can be said with entire justice that testimony concerning occurrences such as happen on many trips, when given by witnesses whose attention was not called to the matter until several trips had intervened, is by itself of little weight compared with testimony of witnesses having no connection with the controversy, to whom the occurrences of which they speak were not in the ordinary routine of their business, and whose attention was directed to the facts of which they testify at the time of their occurrence. But in confirmation of the testimony of those in charge of the navigation of the Connecticut, that the Connecticut on the afternoon on June 26th stopped below Grand street, and therefore could not have been at full speed when passing South Third street, the pilot, Vanderwater, and a deck hand, Crawford, of the ferry-boat Idaho, which left Brooklyn at 6:50 P. M. on June 26th, are produced, and testify that while on that trip they saw the Connecticut stop below them. But while the testimony of these two witnesses is sufficient to prove that on some day, while the Idaho

was passing from Brooklyn to New York, the Connecticut stopped below Grand street, an examination of their statements makes it plain that they have no actual knowledge that the stoppage which they speak of occurred on June 26th. To supply this defect Mr. Chappel, the superintendent of the ferry, is called, who produces an entry made by him in his memorandum book, as follows: "Vanderwater made Connecticut stop 7 P. M., June 26th, 1889. Want him in office to-morrow." But Mr. Chappel had no personal knowledge of the fact that the Connecticut stopped on June 26th, and I do not understand him to swear that he made the entry above quoted on June 26th. The entry reads as if made on a day subsequent to the 26th, and its language, as well as its position in Mr. Chappel's memorandum book, leads to the belief that the date stated in it was furnished to Mr. Chappel after a claim was made upon the owners of the Connecticut for damage done on June 26th.

As further strengthening the conclusion that the trip of the Connecticut on which the accident occurred was a different trip from that spoken of by the witnesses from the Idaho, it is to be noticed that the trips described do not agree in their incidents. One difference, among others, may be mentioned. The master and pilot of the Connecticut, giving a reason for the stoppage, which they testify to, say that they stopped to allow the passage ahead of the Connecticut of a tow, consisting of a tug, with a sand-boat along-side and a schooner astern on a hawser, and the evidence of the wheelman of the Connecticut greatly confirms this description of the tow which caused the Connecticut to stop, for he says that he saw the tow, and, thinking the schooner on the hawser was from his place of residence, he went to the rail to see her, but on looking discovered that it was a different schooner. But the tow which the witnesses from the Idaho say made the Connecticut stop was a Pennsylvania boat, with five canal-boats along-side,—five on one side and two on the other. The discrepancy seems to point strongly to a confusion of trips. It is noticeable in this connection that while the answer alleges that a ferry-boat was crossing from New York to Brooklyn when the Connecticut stopped, no witness from any such ferry-boat is produced, but witnesses from the Idaho are produced, to the presence of which ferry-boat no allusion is made in the answer. Still further, as bearing on the question whether the trip of the Connecticut spoken of by the witnesses from the Idaho was the trip on which the accident occurred, it is to be observed that the witnesses from the Idaho say that the Connecticut stopped below Grand street when the ferry-boat was on the 6:50 trip from Brooklyn. But by the log-book of the Connecticut, put in evidence by the claimants, it appears that on the trip of June 26th the Connecticut was at Hallett's point at 7 P. M., and to cover the distance from Grand-Street ferry to Hallett's point between 6:50 and 7 o'clock would compel her to move at the rate of 30 miles an hour. Clearly, then, if the Connecticut was at Hallett's point at 7 P. M. on June 26th, as her log-book shows, it could not be on that trip that she was seen to stop below Grand street at 6:50 P. M. by the witnesses from the Idaho. Still further, as bearing on the question whether on the afternoon of June 26th the Connecticut stopped

below Grand street, notice must be taken of the engineer's log, kept by the engineer of the Connecticut on that trip. In this log there is no entry of stopping the engines on that trip. According to the engineer's log, as explained by him, on the trip of June 26th the engines of the Connecticut were not stopped at all, and were slowed for only one or two minutes before reaching Providence river. In this state of the testimony it can hardly be doubted that the weight of the evidence is that the lighter was upset by a swell caused by the Connecticut. But it is said the ship's log kept on board the Connecticut, and now produced, affords positive and indisputable evidence that the Connecticut was stopped below Grand street on July 26th. This log contains an entry made by the pilot, Penn, in the log of the voyage of July 26th, as follows: "6:51 P. M. Slowed at Point Hook and stopped at Grand street." On the part of the libelant it is insisted that the character of this and other entries made by Penn, as they appear in the log, and the effect of certain alterations of figures which appear in the engineer's log, show that the logs have been tampered with in order to support the statement of those navigating the Connecticut, that on June 26th she stopped below Grand street.

After a scrutiny of the entries as they stand in the ship's log, and the alterations of figures that appear in the engineer's log, I am forced to the conclusion that these logs have been designedly altered. No explanation of the corrections of these logs by testimony has been attempted, but the suggestion is made that the alterations of figures in the engineer's log are simply corrections of mistakes, and that as to the entry in the ship's log there is no evidence whatever to contradict the statement of Penn that he made the entry in the form it now has on June 27th, in the regular course of business, confirmed by the master that when he signed the log it was in its present condition. While I am not prepared to say that there is sufficient in the character of the entries on the ship's logs by themselves to justify a conclusion that these entries were not made when Penn says they were, yet, coupled with the evident alterations that appear in the engineer's log, indicating design, there is enough in the character of the entries to excite grave suspicion. Absence of motive is relied on to overthrow this suspicion. But all familiar with litigation of this character know that mere desire for the success of their ship in a litigation affords motive sufficient to induce seamen, not only to make false statements under oath, but sometimes to falsify the log. Perhaps all that it is necessary to say in regard to this branch of the case is that the log does not, in my opinion, strengthen the case of the claimant. My conclusion from the whole case, therefore, is that it satisfactorily appears that the damage sued for was caused by an extraordinary and dangerous swell made by the passing of the Connecticut too near the piers, at high speed. A decree must accordingly be entered in favor of the libelant, with an order of reference to ascertain the amount of the loss.