# D. FISCHER ET AL. v. CAMDEN ETC. FERRY CO.

ERROR TO THE COURT OF COMMON PLEAS NO 1 OF PHILADEL-
PHIA COUNTY.

Argued January 25, 1889—Decided February 4, 1889.

1. Under Rule 21, § 4233, Rev. St. of the U. S., requiring that
   " Every steam-vessel approaching another vessel, so as to involve risk
   of collision, shall slacken her speed, or, if necessary, stop and reverse,"
   a steam-vessel is not bound to change her course for a row-boat :
   Phila. etc. R. Co. v. Adams, 89 Pa. 31, approved.
2. In this action, brought by parents to recover damages for the death
   of a minor son, run down in a row-boat by a steam ferry-boat, the
   evidence disclosing contributory negligence on the part of the son,
   and no negligence on the part of the defendant's employees, it was
   not error to order a judgment of compulsory nonsuit.

Before PAXSON, C. J., STERRETT, WILLIAMS, McCOLLUM
and MITCHELL, JJ.

No. 226 July Term 1888, Sup. Ct.; court below, No. 361
June Term 1886, C. P. No. 1.

On June 29, 1886, Dominikus Fischer and Mary, his wife,
brought an action on the case against the Camden & Philadel-
phia Steamboat Ferry Co., to recover damages for the death
of their son, claimed to have been caused by the gross negli-
gence of the defendant company's servants.   Issue.

At the trial on May 8, 1888, the following facts were made
to appear in the plaintiffs' case:

On August 9, 1885, Adolph Fischer, the plaintiffs' son, then
about fourteen years of age, with five other boys, hired a row-
boat at Poplar street wharf.   But one of the boys knew how
to row a boat and he very little ; some of them had never been
in a boat before.   They crossed to the Jersey shore.   On their
return, the tide was going out, and while rowing against the
tide, about a square out from the Pennsylvania shore and
about half a square below the Market street dock, they first
observed the ferry-boat of the defendant company coming from
Camden and rounding the upper end of Smith's island, about

Statement of Facts.

two and one half squares away. They continued to row until the ferry-boat was about half a square away and bearing directly upon them when they dropped their oars, threw up their hands and cried, " Mister, please stop the boat; we can't swim."

John Thumm, a passenger on the ferry-boat testified:

" So, then, when we got about seventy yards the pilot gave one little slow pull with the whistle, you could just merely hear it, and when he blew the whistle he says: 'Damn it to hell! What the hell are you doing there anyhow?' Just as we were about thirty yards, the boys they got up and waved their hats and hands, and they reached out their hands: 'Mister, please stop the boat!' I hollered to the boys; I said: 'Boys, hold on to your boat as tight as you can!' When the boat got close I laid down on the deck and I caught hold of a couple of the boys and I reached them up on the deck. Just as that there was another man coming jumping over the gates to my assistance, to help me up with the boys."

Two of the boys were drawn upon the ferry-boat; two remained in the row-boat; the witness jumped into the river and at the risk of his own life saved a fifth; the sixth was lost.

" Q. How far did you say, when the boys stopped rowing, were they from the steamboat? A. About seventy yards, when they stopped rowing.

" Q. And the steamboat did not change its course? A. No, sir; never reversed, or stopped, or anything; but just flew right on.

" Q. Did it go fast? A. Yes, sir; on a pretty good rate."

Peter Ott, another passenger on the ferry-boat, testified that the boys were standing up when the boat was fifty yards away. On cross-examination:

" Q. I understood you to say that the steamboat did not slacken up. Did it slacken up? A. Not to my knowledge. The boat came right on, straight on its course, to this dock. He could have reversed his boat in any way at all, while he was at that distance away. Q. Had the steamboat slackened up at all before that time? Had it slowed up at all? A. The boat came right on its course."

Benjamin Ebert, one of the rescued boys called:

" Q. You would have been going away from them all the

Arguments.

time, if you had stopped rowing, would you not? A. We would be away from them, but they would have ketched us and turned the boat.

"Q. Why did you say that? You said the rollers would have caught you. A. The reason was, that if we could get above it, it would not be as bad.

"Q. That is what you thought at the time? A. Yes, sir."

On cross-examination: "Q. You thought it was better to try to get above the boat? A. Yes, sir; because the tide was coming down. There would have been wharves there into which we could turn, while below, all those wharves were where ferry-boats generally start from."

By the court: "Q. What did you say? A. We thought if we could get above it, there is more wharves we could get in where we would get shelter from the rollers, while most of the wharves that were below were where the ferry-boats go in, and we did not trust that."

When the plaintiffs rested their case, the court, ALLISON, P. J., on motion of defendant's counsel, directed the entry of a judgment of compulsory nonsuit, with leave, etc. A rule to vacate the judgment of nonsuit was subsequently discharged, when the plaintiffs took this writ, assigning as error the entry of said judgment, and the order refusing to vacate the same.

*Mr. Henry D. Wireman*, for the plaintiffs in error:

I. The defendant's servant was guilty of gross criminal negligence.

"In considering the validity of a compulsory nonsuit, it is the duty of the court to assume the truth of the plaintiff's evidence, and deduce therefrom every reasonable inference of fact, in his favor, that might be drawn by a jury. In this respect, it is substantially the same as a judgment for defendant on demurrer to evidence:" Jones v. Bland, 116 Pa. 193. We maintain that the evidence warrants us in declaring that the captain or pilot of the ferry-boat was guilty of the grossest kind of negligence, criminal negligence. The point that a person not blind is not presumed to see what takes place before his unobstructed view, but that it must be shown by positive evidence that he actually did see what transpired before him,

was raised and rejected in Rommel v. Schambacher, 120 Pa. 579.   And it is no excuse to say that efforts were made to prevent the collision, if those efforts were made too late to be successful.   " When the master of a vessel could not have prevented the accident at the moment it occurred, this will not excuse him, if, by timely measures of precaution, the danger could have been avoided: The Syracuse v. Langley, 12 Wall. 167; The Vanderbilt v. McKibben, 6 Wall. 225.

II. The boys were not guilty of contributory negligence in not allowing themselves to drift with the tide, when they first saw the ferry-boat bearing down upon them.

" As a rule we may say that a person is not chargeable with contributory negligence who, when unwarned peril comes on him, instinctively, under the influence of terror, encounters a danger which had he remained passive he might have escaped. The same remark applies to cases in which a party, compelled suddenly, when put in a position of danger by another's misconduct, to choose between two alternatives, chooses the alternative that ultimately proves the worse : " Wharton on Negligence, 2d ed., 304; The City of Paris, 9 Wall. 638; Brown v. French, 104 Pa. 604; Penn. R. Co. v. Werner, 89 Pa. 59; Murphy v. Crossan, 98 Pa. 495; Schmidt v. McGill, 120 Pa. 405; North Penn. R. Co. v. Kirk, 90 Pa. 15; Schum v. Railroad Co., 107 Pa. 8.

III. Admitting, for the sake of the argument only, that the boys were guilty of contributory negligence, we submit that that fact did not give the captain of the ferry-boat the right to run down the row-boat and kill an occupant with impunity.

" An engineer who sees a helpless person, incapable of moving, on the track, is guilty of negligence if he does not make all prudent efforts to avoid a collision : " Wharton on Negligence, 2d ed., 306, 313.   " Though a person be injured while unlawfully on the track, or contributes to the injury by his own carelessness or negligence, yet if the injury might have been avoided by the use of ordinary care and caution by the railroad company, they are liable for damages for the injury : " Wharton on Negligence, 2 ed., 388.   To the same effect are: Penn. R. Co. v. Lewis, 79 Pa. 33; Lackawanna etc. R. Co. v. Chenewith, 52 Pa. 382; Gray v. Scott, 66 Pa. 345; Morrissey v. Ferry Co., 43 Mo. 380 (97 Amer. D. 402); O'Flaherty v.

Railway Co., 45 Mo. 70 (100 Amer. D. 343); Trow v. Railroad Co., 24 Vt. 487 (58 Amer. D. 191). In Phila. etc. R. Co. v. Adams, 89 Pa. 31, there was nothing to show that the occupants of the row-boat could not get out of the steamboat's way. Justice WOODWARD said: "A crippled condition of the boat, inadequate appliances, or the inability of the crew to escape, shown to have been known or apparent to the captain, would change this relation and responsibility at once."

IV. It was the duty of the ferry-boat to get out of the way of the row-boat.

We submit that experience has taught that the doctrine established in Phila. etc. R. Co. v. Adams, 89 Pa. 31, is a standing menace to all persons called to go upon the rivers in rowboats. Experience teaches that the recklessness of steamboat pilots, armed with the law as enunciated in that case, propagates collisions often resulting in loss of life. Besides, the doctrine there established is against the spirit if not the letter of the navigation laws of the United States. "Every steamvessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop or reverse:" Rule 21, Rev. St. U. S., § 4233. A row-boat is a vessel: Worcester; Webster. Another rule is applicable: "In cases of collision between a stationary and a moving vessel, the presumption of negligence is against the latter:" Culbertson v. Shaw, 18 How. 584; Fretz v. Bull, 12 How. 466.

*Mr. G. Tucker Bispham*, for the defendant in error:

I. The boy who was drowned, together with his companions, was guilty of contributory negligence.

There was absolutely nothing to prevent the boys, when they first saw the ferry-boat, from remaining in a place of perfect safety, until the ferry-boat had gone by and gone into her slip.

II. There was no sudden danger which was brought about by any misconduct on the part of the defendant's employees.

The vice of the argument on behalf of the plaintiffs upon this point is, that the authorities which he cites are inapplicable, as the case lacks the essential feature to bring it within the doctrine in question, inasmuch as the danger which produced the state of terror, if any, was not shown to have been brought

about by any negligent conduct on the part of the defendant's employees: Penn. R. Co. v. Werner, 89 Pa. 59; Wharton on Negligence, 2d ed., 304.

III. There was no wilful running down of the row-boat.

It must be borne in mind, in considering this question, that there was no duty upon the pilot of the steamer to stop his boat or change his course, unless and until he saw and had reason to believe that it was impossible for the boys, owing to some disability, to get out of the way : Moore v. Railroad Co., 108 Pa. 349. This rule has been applied to minors: Penn. R. Co. v. Hummell, 44 Pa. 375; Anderson v. Railroad Co., 12 Phila. 369. None of the cases cited by the plaintiffs justify the conclusion to which he seeks to bring the court. The doctrine of Phil. etc. R. Co. v. Adams, 89 Pa. 31, had been laid down by this court in Railroad v. Norton, 24 Pa. 465, where it was held that the mere negligence of the conductor was insufficient to take the case out of the general rule that where both parties are in fault there can be no recovery. "If, therefore," said the court, "a man plants himself on the rail, he must not expect the law to do more for him than punish a wanton injury." In the case at bar, there was no evidence sufficient to go to the jury, that the captain of the steamer acted wantonly or maliciously.


OPINION, MR. CHIEF JUSTICE PAXSON:

We are asked in this case to reconsider and overrule Philadelphia and Reading Railroad Company v. Adams, 89 Pa. 31, where it was held that "a row-boat is not within the steering and sailing rules embodied in the navigation laws of the United States, and a steamer is not bound to change her course for such a boat."

The rule referred to is as follows : "Every steam vessel when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop or reverse :" Rule 21, § 4233, Rev. St. of the United States. The meaning of this rule is that a steamer must keep out of the way of a sailing vessel, and the reason is that the steamer is more easily handled. It was urged, however, that a row-boat is a "vessel," and, therefore, within the rule. We must construe the word "vessel" as it is popularly understood, for such is the sense

in which the law-making power probably used it.   When we speak of a row-boat we do not mean a " vessel," as that term is generally understood.   Nor does the reason of the rule apply to row-boats.   Of all water craft they are the most easily handled.   A few strokes of the oars, in the hands of competent men, will take a row-boat out of the path of an approaching steamer.   The latter is confined to a channel, often narrow, whilst the row-boat requires but a few inches of water to float it. To apply the rule above quoted to such craft would be a palpable misapplication of it, and would wholly ignore the reason upon which it is founded.

The fact that a row-boat is bound to keep out of the way of a steamer, would not justify the latter in wilfully running down the former.   As was said by Justice WOODWARD in the case cited : " A crippled condition of the boat, inadequate appliances, or the inability of the crew to escape, shown to have been known or apparent to the captain, would change this relation and responsibility at once."   So we say here.   When the pilot saw the boys in the boat they were, according to the testimony, from thirty to fifty yards away, probably about the length of the boat.   The row-boat was directly across the steamer's path, with the tide against it.   A few strokes of the oars would have backed it out of harm's way.   Or had the boys stopped rowing, and floated with the tide, when they first saw the steamer, they would have avoided the collision.   How was the captain or pilot to know that they were a party of inexperienced boys, who had never been in a boat before and knew nothing about handling it.   They were not children, so small that their appearance would proclaim their helplessness. When the pilot saw their condition, provided he fully realized it at all, the steamer was close upon them, and there is no reliable evidence that it could have been stopped, or its course changed so as to avoid the boat.   It is true Peter Ott, a passenger on the steamer, testified that the pilot might have changed his course, or to use the precise language of the witness, " He could have reversed his boat in any way at all." But the witness did not say that the collision could have been avoided.   Nor was his testimony upon this point of any importance.   He was a mere passenger ; knew nothing of navigation, or the handling of a steamboat, and it would be as rational to

call a cobbler as an expert in medical science, as to permit a jury to render a verdict upon such testimony as this.

We find nothing in the case to charge the company with negligence. On the other hand, it was negligence amounting to recklessness, for these boys, who did not know how to handle an oar, to go out in a row-boat on the river front of a large city, crowded as it is with steamboats and water craft of all kinds. The accident was certainly a deplorable one, but it would be unjust to make others pay for the consequences of their own rashness. The nonsuit was properly entered.

Judgment affirmed.