### THE KRONPRINZESSIN CECILIE.

(District Court, S. D. New York.   June 10, 1909.)

SHIPPING (§ 81*)—SWELL DAMAGE—EVIDENCE.

The steamship was obliged to stop at Quarantine and lost her headway, so that it was necessary to put her engines at half speed to regain steerage way. In doing so, she created a swell which caused damage to a tug and tow entering the channel to Greenville. Held that the steamship was in fault.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. § 345; Dec. Dig. § 81.*

Liability of vessel for injuries caused by creation of swell, see note to The Asbury Park, 78 C. C. A. 3.]

(Syllabus by the Judge.)

Robinson, Biddle & Benedict, for libellant.
Choate & Larocque, for claimant.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

ADAMS, District Judge. The libellant, the Long Island Railroad Company, the charterer of the tug Patchogue and Car Float No. 14, brings this action against the steamship Kronprinzessin Cecilie, a North German Lloyd steamer, to recover the damages caused to the former vessels by swells from the latter on the 14th of January, 1908. It is alleged that the tow was proceeding from Long Island City to Greenville, New Jersey, and when in the entrance of the channel to the latter place and heading to the westward, the steamship passed, going up the bay, with such great speed and so near that swells were caused by which the tug and float were injured to the extent of $4,000.

The answer of the steamer, after some admissions and denials, states:

"Seventh: It alleges that on the day in question the steamship 'Kronprinzessin Cecilie' passed up the main ship channel from Quarantine to her pier at Hoboken, New Jersey, proceeding at all times at an exceedingly reasonable rate of speed; that in fact she barely maintained steerage way; that said steamship at all times observed the rules of the road and proceeded with due regard to other shipping and that if on the day in question the steamtug 'Patchogue' or carfloat No. 14 sustained any damage, the same was not attributable in any way to any negligence, carelessness or improper conduct on behalf of those in charge of said steamship 'Kronprinzessin Cecilie' but that the same was caused or contributed to by the negligence and incompetence of the master, officers and crew of said steamtug and carfloat, as upon the trial will more fully appear."

It appears that the float was 267 feet long and 36 feet wide. The tug was 101 feet long and 25 feet wide. There was a wind of about 12 miles an hour from N. W. by N. The tug was on the starboard side of the float, her stem being about amidships and her stern extending to within about 15 feet of the stern of the float. She was made fast by lines running from the tug's nigger head to a point forward on the float, and by a towing strap running from the side bitts of the tug to the side post of the float, and another set of lines running from aft on the tug to another post on the float. When all the lines were made fast, they were tightened by a winch on the tug in the customary manner. The tow came around through the East River and turned into the Greenville Channel, going under a slow bell. Just before the accident she stopped her engine.

The steamship, a vessel of about 20,000 tons, 707 feet long, drawing 26 feet, was passing up to her pier in Hoboken on one of her regular west bound trips. She took a pilot at Sandy Hook and proceeded slowly to the Quarantine Station, arriving there at 10:40 a. m. She left at 11:03, with the mail boat alongside, engaged in the transference of the mails. This, and some other boats which were alongside, were cast off shortly after leaving the station. It was then found that the ship had lost steerage way and in order to regain it, half speed was deemed necessary by her navigators and at 11:41 both her engines were put at half speed ahead and remained so until 11:53. When her engines were put at half speed, the steamer was about opposite Robbins Reef. At 11:53 she slowed again, and went to her dock. At 11:56, she passed Liberty Island. Going at half speed, with 6 of her 19 boilers out of commission, and the steam allowed to run down, as was usual in entering port, she covered 2 nautical miles,

or more, the distance between a point opposite Robbins Reef and a point opposite Liberty Island, in 15 minutes, a speed at the rate of something slightly over 8 nautical miles an hour, and it is shown that when she started at half speed she was so nearly stopped that her steerage way was practically lost and for 3 minutes just before reaching a point off Liberty Island, her engines were at slow again. The master stated that the maximum speed under a half speed order did not exceed 8 knots through the water, which allowing for a 2 knot ebb tidal current would be 6 knots over the ground, but what the speed over the ground was is not of great importance as it is evident that the speed through the water is the force that creates a displacement wave.

Having covered the distance in the time mentioned, the inquiry is whether such speed was sufficient to create an injurious swell. She started under half speed from a position in which she was practically stopped. The engineer said it would take about 2 minutes for the engines to obtain the half speed number of revolutions, and during the last 3 minutes of her run up to Liberty Island, she was under a slow bell. It is evident, therefore, that in passing the point where the swell was encountered, she was going considerably faster than the average of a little over the 8 knots mentioned, fast enough in fact to create a swell which proved injurious to the tug and tow in the manner described, because there can be no question that the steamer did cause such a swell.

It is not very material, however, what the speed of the steamer was. In discussing the speed of The Majestic, 48 Fed. 730, 1 C. C. A. 78, Judge Lacombe said, speaking for the appellate court in this district:

"Be that as it may, however, it is plain, upon the proof, that a wave was thrown up by the steamer, which made navigation unsafe for the canal-boat, although she was, so far as appears, a proper craft to navigate the waters of the upper bay, and was attached to her tug in a proper way for towing with the natural conditions of wind and waves, such as they were that day. If, when moving at seven knots an hour, and the distance of half a mile, the Majestic produces such results, then there is something in her size or build which makes it necessary for her officers to be watchful of craft they pass at that distance, as well as of those in the immediate vicinity, and to regulate her motions accordingly. It will not do to say that the swell that she throws is no higher than such as are produced by a high wind in these waters. A high wind had not, on this particular day, rendered the bay unsafe for river craft. They were entitled to navigate there, and the proposition cannot be maintained that harbor waters may be put at all times and at all seasons in a perilous condition for smaller craft, by the rapid movements of large ocean steamers, as they are occasionally by the prevalence of a gale of wind. Such waters are not to be appropriated to the exclusive use of any one class of vessels. We do not mean to hold that ocean steamers are to accommodate their movements to craft unfit to navigate the bay, either from inherent weakness, or overloading, or improper handling, or which are carelessly navigated. But of none of these is there any proof here, and, in the absence of such proof, we do hold that craft such as the libellant's have the right to navigate there without anticipation of any abnormal dangerous condition, produced solely by the wish of the owners of exceptionally large craft to run them at such a rate of speed as will insure the quickest passage. To hold otherwise would be virtually to exclude smaller vessels, engaged in a legitimate commerce, from navigating the same waters."

This language is very appropriate for the case under consideration. There is no doubt that the steamer caused a wave which proved injurious to these boats. Probably the steamer ordinarily in passing up the bay does so at such a moderate speed that no injurious waves are caused but in this instance, doubtless owing to the detention at Quarantine and the necessity for obtaining control of the steamer again, she was put at a rate of speed necessary for that purpose, but such necessity is no excuse for the damage caused to the tug and tow. I see no fault on the part of the tug. She slowed and stopped her engines when she saw the wave coming. There was not sufficient time or apparent necessity for casting off her tow.

Decree for the libellant, with an order of reference.