(61 South. 401.)

No. 19,225.

SALMEN BRICK & LUMBER CO., Limited, v. SOUTHERN PAC. CO.

(Feb. 17, 1913. Rehearing Denied March 17, 1913.)

*(Syllabus by the Court.)*

1. APPEAL AND ERROR (§ 173*)—DEFENSES—NECESSITY OF PRESENTATION BELOW.

In a suit against the owner of a steamship for the value of lumber which has been overturned from a barge by the alleged negligent conduct of the steamship, it is too late to urge for the first time in the argument that the plaintiff was negligent in not having provided the barge with fenders, and to contend that the absence of these fenders was the cause of the accident to the barge. It was incumbent on the defendant as a part of its defense to show that the barge was not properly protected from

the wash of steamers proceeding down the Mississippi river.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1079–1089, 1091–1093, 1095–1098, 1101–1120; Dec. Dig. § 173.*]

2. SHIPPING (§ 81*)—STEAMSHIPS—NAVIGATION OF RIVERS—NEGLIGENCE.

It is the duty of a steamship proceeding down the Mississippi river to act in a manner that will not cause damage to vessels moored to the bank, and the owner of the steamship cannot relieve itself of this obligation by urging that the negroes on a barge which it has overturned by its great speed should have warned the crew of the steamship to proceed slowly and cautiously, particularly when the barge could have been seen by the crew of the steamship.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 341, 344, 345, 347; Dec. Dig. § 81.*]

3. APPEAL AND ERROR (§ 1008*)—FINDINGS BY TRIAL JUDGE—REVIEW.

As the trial judge heard the witnesses testify, and as there is nothing manifestly incorrect in his appreciation of the evidence, his finding on the facts will not be disturbed.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3955–3978; Dec. Dig. § 1008.*]

4. DAMAGES (§ 69*)—RIGHT TO INTEREST.

In an action sounding in tort, interest begins to run from the date of the judgment, and not from the date of the tort.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 137–140; Dec. Dig. § 69.*]

5. SHIPPING (§ 81*)—NEGLIGENCE—NAVIGATION OF VESSELS—SWELL.

A vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion of the waters at the place of the accident.

[Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 341, 344, 345, 347; Dec. Dig. § 81.*]

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by the Salmen Brick & Lumber Company, Limited, against the Southern Pacific Company. Judgment for plaintiff, and defendant appeals. Affirmed.

Denegre & Blair and Victor Leovy, all of New Orleans, for appellant. Gustave Lemle, W. Catesby Jones, and Foster, Milling, Brian & Saal, all of New Orleans, for appellee.

BREAUX, C. J. Plaintiff sued for damages in the sum of $4,101.72, with legal interest from February 1, 1908. Plaintiff charges that on or about the 1st day of February defendant by its negligence caused it to lose a barge load of lumber and creosote piling. Plaintiff states that about the 1st day of February its agents and employés properly moored its barges loaded with lumber on the banks of the Mississippi near Belair, La.; that the steamer Creole of defendant company passed the point at which the barges were moored at such a high rate of speed and so close to the barges that the swell and suction of the steamer before named overturned one of the barges and the lumber and piling fell into the river; that the steamer Creole passed in the daylight, and that the barge could easily be seen by all of defendant's officers and employés on the steamer; that, had they been careful, the steamer could have passed without causing the loss of its barge. Plaintiff lays the whole blame for the loss on the defendant, and denies all negligence on its part.

The facts disclose that plaintiff's tugboat on leaving Slidell, La., had four barges in tow loaded with lumber and creosote piling, to be delivered to the federal government, the purchaser. The tug, towing the barges, had to pass across Lake Pontchartrain, through to the Rigoletes into Lake Borgne, and through Lake Borgne canal into the Mississippi on the way to the village of Berwood, La., at or near the mouth of the Mississippi river, to deliver there the freight on the barges to the government. The barges were numbered 4 and 7 and 6 and 8. On landing them above Belair, La., at which place it was necessary to land them, they were fastened to the bank side by side; 6 and 8 in front, and 4 and 7 just behind. Barge No. 6 was the one broken, it is alleged, by the waves of the river caused by the rapidly passing Creole on its way down to Southwest Pass.

The lumber and piling corded on the deck

of the barges were about eight feet higher than the barges. We infer that the top of the barges was about two feet out of the water. The pieces of lumber and piling were properly corded and fastened to eyebolts on the deck and after the fastenings had been properly placed.

The tug which towed this little fleet of barges was manned by a captain and a crew of white men, save two or three, altogether some six or seven men. The tug met with an accident. The cylinder· head broke a short distance above Belair, while they were on their way down to the Pass. · The tug in its crippled condition was entirely useless and helpless, and could not tow at·all nor direct the course of the barges: · The captain of the· boat ·determined to land and· moor his barges to the bank of the· river, and retrace his course to New Orleans in order to have the tug repaired. As the tug could be of no service, two men in a skiff managed to tow the barges around in order to head them upstream. They were finally moored at a point about a mile above Belair. The tug and its crew returned to New Orleans for the needed repairs.

In addition to the crew on the boat, there were four negroes on the barges, dubbed captains. They were captains and crew as well, as there was no necessity for a crew on the barges.

On the second day after the tug returned to New Orleans it returned and arrived at Belair a short time after ·the accident.

The plaintiff alleged, and attempted to prove, that on the day of the accident the Creole at its rapid rate of speed caused the swelling of the waters and the waves causing the barges to jolt against each other. The jolting ·between the two was such that it caused one of the planks of No. 6 to break, and the water that flowed into the barge caused it to career over and dump her load. As the specific ·gravity of the piling and lumber, made heavier by the drying process and the creosote, was greater than that of water, that part which was heavier immediately sank. The other lumber floated away. Some of it was saved and credited on plaintiff's claim.

As before stated, about two hours after this accident, the tug returned from New Orleans.

The contention of plaintiff is that the barges were properly fastened to the shore, and the colored witnesses who remained with the barges testified that other steamers had passed down without causing damages.

The tug then carried three of the barges down the river to Berwood, La., and left the damaged barge opposite or near the dwelling house on the Belair Plantation. On its return, after it had delivered the load of the three barges at the Pass, the tug returned to Belair, and took the crippled barge in tow and conveyed it back to Slidell.

The white deck hand, Snyder, who has since become captain of one of plaintiff's tugs, testified that they moored the barges about a· mile above Belair. In this he is corroborated by the other witnesses. The uncontradicted testimony is that the barges were properly fastened together, and properly moored. The piling of the barges was laid fore and aft, and there were three chains around the piling, one chain at each end and one in the middle. There was also a Spanish windlass on deck to tighten the chains. There were also wire cables used. The manner of tying or making fast lumber on the barges was the same in this instance as in loading other barges of plaintiff, and was considered entirely safe.

[1] The contention of the defendant now is, for the first time, that these barges should have been protected by fenders, and that it was incumbent upon the plaintiff to prove that there were fenders; that, if they had had fenders, it would have been sufficient protection against the waves.

The necessity for fenders depended· upon

the evidence. Defendant cannot successfully urge on appeal that plaintiff should have proven that there were fenders. It was incumbent upon defendant to show that it was not true that the barges were properly moored and without fenders or their equivalent.

The negro witness who was present when the accident happened, together with other witnesses, also negroes, said that barge No. 8 knocked the boards of No. 6 out; that the three chains were broken by the dashing of the waters; that the steamer was running fast, and the waters were lashing the banks.

It was during a high stage of the water.

The witnesses for the defendant on board the vessel knew nothing about the accident They did not see the loaded barges, and they passed on. It is said that they usually follow midstream, and they did not know that they had deviated therefrom on that occasion; on the contrary, they were of the impression that they had not.

It is well known that a ship following the current will sometimes oblique to the right or to the left; that opposite points on the river in high water, boats sometimes find it convenient, to use a venacular phrase of river people, "to cut the point"; that is, pass nearer to the point than to the middle of the river in order to lessen distances.

[2] The contention on the part of the defense is that the hands on deck—in other words, the three negro captains—should have signaled the vessel to moderate its speed.

It is common knowledge the heavy waves rolling toward the high banks are only seen when the boat passes or is about to pass, too late for signaling.

One of defendant's contentions is that, according to the testimony, the date of the accident was the 31st day of January, and that there was no Morgan vessel leaving port on that day, that the Creole left the next day, the 1st of February.

Snyder, the deck hand, testified that the accident was on the 1st of February, and that, when they returned from New Orleans on that day, the accident had happened.

Able counsel at one time, in so far as relates to the 1st of February, did not seem to question the date, as will be seen by the following question propounded by him to one of the witnesses:

"Q. This suit, it is said, is about a barge which turned over on February 1, 1908?"

In regard to the hour, the witnesses do not agree. It varies from 11 o'clock a. m. to 2 or 3 o'clock p. m. Witnesses are not always careful about noting the time of day. The negro captains state positively that they were present, and that the vessel was the cause of the accident.

[3] The next position of the defendant is that Mr. Dymond, a planter, was contradicted by the negroes, and that the judge a quo believed these negroes.

We have very carefully read the testimony of all the witnesses particularly on this point. It does not in the least appear that the negro witnesses sought to question his testimony, nor have they in reality questioned it. It must be said that the planter, busy, doubtless, about his own affairs on his place, was not particularly observant of passing occurrences. He said that there was a gale on that day. We are not informed of the direction of the gale, nor of the effect it had upon the waters. We have no evidence to determine which of the four winds was the asserted offending cause. Some one has said that we should not think too unfavorably even of the east wind. He also testified that he went to his field, and returned about two hours afterwards, and there was an empty barge immediately in front of the Belair residence. No question, he said, but that one of the barges was "right in front of the residence. It was empty." There was a tugboat alongside. He met a white man who was on the tugboat, St. Tammany,

and he said to him that he had stopped at a dangerous landing; that the current in front of the Belair residence was stronger than anywhere else along the river. He unquestionably located the barge in front of the Belair residence on the river. The fact remains that, if he saw the river, he paid no attention to the waves or to the swollen waters. The evidence is incredible at this point. It is incredible, not because of the testimony of the negroes particularly, but because it is inconsistent with the facts and circumstances as detailed by other witnesses. All of this was after the accident, since the barge was empty. Mr. Dymond's statement about dates was not specially accurate. There was also some incongruity of statement in his testimony in regard to the loaded barges, but this can easily happen to any one, and is readily explained, and is in no way contradicted by the negro captains. He did not know that a ship had passed. The fact is that he did not see the accident; that he paid no attention to the river.

The negroes, on the other hand, were present, and, if they chose to tell the truth, they knew what had taken place. They saw the barges tossed about, the chains break, and the water entering through the space left by the broken plank. In all of this there is no special contradiction of the evidence of Mr. Dymond. These negroes underwent the grilling process of a cross-examination conducted by learned counsel. The trial judge who heard them, and who had an opportunity personally to judge of their truthfulness in regard to the accident, arrived at the conclusion that they sought to tell just what they saw.

It may be said of the negroes on the barge that they had no interest whatever, and the evidence does not disclose that they had a motive to falsify the facts. They were subject to orders. All that had been done was done under the orders of the captain in charge of the tug. They were not responsible. The employer, plaintiff, testified. His testimony did not create the impression that he was one who would seek to influence his laborer to tell untruths in order to gain advantage in the suit.

The law is consistent and decisive. The following cited decision is plain: The flat boat had been moored at a place at which the owner had the right to make it fast to the bank. The onus of proof was on defendant to show that the accident was unavoidable. Dunn and Sackett v. McComb, 11 La. Ann. 325.

The defendant sought to meet the force of this decision by citing authorities in support of its position that even if the story of the three negroes be credited, whereby they sought to make the Creole the cause of the heavy sea on the 1st of February, 1908, and that she moved a quarter of a mile out of her course, the dangerous place at which the barges were placed and the failure of these negroes to signal the vessel were more than sufficient grounds to defeat plaintiff's claim for damages.

In support of this defense several decisions are cited. Myers v. Perry, 1 La. Ann. 372; Murphy v. Diamond, 3 La. Ann. 441; Reese & Seger v. Steamer Mary Foley, 6 La. Ann. 71, 54 Am. Dec. 557; Edgell v. Barataria & Lafourche Canal Co., 6 La. Ann. 425.

If the premise be admitted that there was fault and want of care, then the conclusion is inevitable.

It was not satisfactorily proven that there was fault. All the witnesses testify that the barges were properly moored at the place not considered by them dangerous. All except one witness, who did not make it appear with any degree of certainty that he knew where the barges were moored at the time of the accident. All other witnesses testified that they were at least a mile above

the landing in front of the residence on Belair, at which place this witness said they were.

Now as to the custom of signaling an approaching vessel. We are not satisfied that the custom applies to a situation such as made evident here. The authorities uniformly hold that a vessel creating a dangerous swell that causes damages to another craft must be at least ordinarily careful and have an eye so as not to injure other vessels with equal navigation rights. The Asbury Park Case (D. C.) 136 Fed. 269; s. c., 147 Fed. 194, 78 C. C. A. 1.

In another case for creating a swell causing damages, the steamship, under a similar state of facts, was held liable for damages. The Kronprinzessin Case (D. C.) 171 Fed. 574.

In another case the vessel was liable because it was negligence to pass so near. The Morrisania, 13 Blatchf. 512, Fed. Cas. No. 9,838.

It rested upon a vessel under way, in order to exonerate itself from liability for an injury, to one which was stationary, to show that it was not in her power to prevent injury by adopting any practicable measure of precaution, and that in shallow water she is bound to know and guard against the effect of the swell and suction caused by her movement.

Extraordinary swells, although arising in the usual manner, are responsible for their effects upon an innocent vessel.

Again, in another case, the court said:

"The Majestic was navigating at customary speed and in a customary way. If such speed and way caused injury to the seaworthy craft of a kind properly in the waters and properly handled, the custom will have to be modified or the privilege paid for."

[5] Damage to the weaker vessel, but careful craft, by vessel causing swells by her displacement effect gives rise to a cause of action.

No great importance was given to the necessity of reasonable notice or warning in the following cases: The Hendrick-Hudson Case (D. C.) 159 Fed. 583; The Chapin Case (D. C.) 155 Fed. 854; The Majestic Case, 48 Fed. 730, 1 C. C. A. 78.

Exoneration is only possible where vessel proves herself blameless by showing that injury was not avoidable. Dunn and Sackett v. McComb, 11 La. Ann. 325; The Rotherfield (D. C.) 123 Fed. 460.

The court held:

The careening of the vessel and consequent damage was caused by an extraordinary swell made by the passing vessel too near the piers at high speed. The latter was held liable in damages. Roger v. The Connecticut (D. C.) 45 Fed. 374.

In the light of the foregoing cited decisions and considering the facts, we have not found it possible to arrive at any other conclusion than that herein expressed.

We have considered this case as carefully as we could, and have arrived at the conclusion that the judgment is correct.

[4] The motion to amend the judgment has no merit. Interest runs from the date of the judgment.

It is therefore ordered, adjudged, and decreed that the judgment appealed from is affirmed.