O'NIELL, J.
Plaintiffs -appeal from a judgment rejecting their demand for damages for the death of their daughter, whoso death was alleged to haye been caused by the .fault and negligence of the employés of the defendant company. She was drowned in the Mississippi river, by the sinking of a small motorboat, in which she was riding, and which was swamped by defendant’s tugboat, towing the railroad company’s transfer barge, carrying a passenger train across the river.
Plaintiffs’ daughter, aged 17 years, was a member of a party of four in the motorboat. The other members were Miss Lorio, 19 years of age, and Messrs. Netzhamer and Rankin, near 21. Tl,rey had been on a pleasure trip up tbe river as far as Kenner, on that Sunday afternoon, and were returning to Southport, where they resided. When they reached a point about 350 feet above the stern of the transfer barge Mastodon, the gas engine in the motorboat suddenly stopped, and Netzhamer, who had been running tbe engine, was unable to start it. It was then 8:30 or 8:40 p. m., and the night was very dark. The motorboat was only 24 feet in length, 6 feet beam, 3 feet draft, and carried a 6 horse power gasoline engine. The current was carrying the gas boat toward the stern of the Mastodon. She measured 366 feet in length and 52 feet in width. Attached to the side of the Mastodon were two large steam tugs, the El Vivo near the stern, and the Restless near the bow. The Mastodon was fastened to the railroad incline, ready to receive a passenger train. In fact, the train was then being placed, in three sections, on the barge, an operation which required six or eight minutes. The tugs had steam up, but their engines were not operating. The barge and tugs were well lighted. Netzhamer and Rankin realized the danger of their situation; and, while the former was trying to start the gas engine, the latter went to the bow of the gas boat with an oar, and tried to paddle the boat ashore. I-Ie had succeeded in turning the bow of the boat toward the shore, but had made little or no headway when the train was aboard the barge, and, in response to a signal from the captain of the Mastodon, the propellers -of the El Vivo be *33 gan turning backward, swinging the stern of the barge out into the river and toward the gas. boat. The latter was then about T50 or 200 feet from the stern of the barge. The bow of the barge was yet tied with a line about 25 feet in length, allowing the stern of the barge to swing out into the river and clear the piling at the end of the incline. The twin screws, or propellers, of the El Vivo were 8 feet in diameter, and their effect, when running backward, was to draw toward them any object astern of the boat. The bow of the El Vivo was tied close to the barge, and the stern stood out about 8 feet from the side of the barge, leaving a triangular space, into which the gas boat was rapidly drawn, partly by the current and partly by the suction caused by the El Vivo’s propellers. From the moment they realized their danger, the four occupants of the gas boat began screaming to attract the attention of some one on the Mastodon or El' Vivo; but the noise of the tugboat prevented their being heard. The gas boat sank as soon as it came between the barge and tugboat. The young men and women clung to a rope extending from the stern of the El Vivo to the side of the Mastodon, and they continued screaming until they were heard by the oiler in the engine room of the El Vivo. He immediately had the engineer stop the engines. The two young men and Miss Lorio were rescued and taken aboard the El Vivo. One of the young men had hold of plaintiffs’ daughter, but lost his hold while he was being rescued, and she sank into the river. Life preservers were thrown overboard and every other possible effort was made by the crew of the barge and tugboats to save the girl.
[1, 2] Plaintiffs charge that the defendant company was negligent in not having a lookout at the stern of the Mastodon or El Vivo. The only lookout on the Mastodon was the captain, who stood at his proper station on the bridge, about 60 feet from the bow of the boat and at an elevation of 40 feet above the water. The only lookout on the El Vivo was the pilot. Both men had a clear range of vision up and down and across the river. The evidence shows they could not have seen an object in the river as small as the gas boat, without a light upon it; but that they could not have failed to see the light if there had been one on the gas boat. The captain of the Mastodon had had many years of experience. He had been six years captain of the Mastodon, carrying 20 passenger trains and many freight trains across the river every day. This accident was the first that occurred during -his administration. He was only 45 years of age, and his eyesight was very good. In fact, he had never worn glasses, and, in compliance with the regulations of hisi position, his sight was tested often.
The three survivors of the party in the gas boat testified that they had a lantern on the boat and that one of the young men waved the lantern while they were all screaming to attract the-attention of some one on the Mastodon or El Vivo. There is a preponderance of evidence, however, that the lantern had gone out. That evidence consists mainly of the testimony of admissions made by each of the three survivors of the accident, at times when they were likely to remember and state the truth.
There was no negligence in the management of the Mastodon or El Vivo bn the night of the accident. As soon as the deck hand had let go the line at the stem of the Mastodop, he gave the usual signal to the pilot of the El Vivo who then gave a long blast of the whistle. The purpose of that signal was twofold, to notify the captain on the bridge of the Mastodon that the stern line was loose, and to notify any vessel nearby that the ferry was about to cross the river. The captain on the bridge of the Mastodon looked astern, *35 and, seeing no boat in the way, he signaled to the El Vivo to start. The pilot on the El Vivo then looked astern, and, seeing no boat in the way, signaled his engineer to start the engines.
It would have been negligence on the part of the captain of the Mastodon or the pilot of the El Vivo to fail to see a light on the gas boat within 200 feet from the stern of the barge. We are sure they did not see a light on the gas boat; and we are convinced by the testimony in the case that there was no light on the gas boat at the time when the captain of the Mastodon and the pilot of the El Vivo should have seen the light if there was one on the gas boat.
There is some testimony to the effect that the two young men on the gas boat were intoxicated at the time their engine stopped. They and Miss Lorio deny that either young man was intoxicated. Whether they were or not is of little or no importance in deciding this case, because it does not appear that a sober mind, or the best of mental faculties, could have averted the accident.
[3] We agree with the district judge that it was not negligence on the part of the defendant company not to have a lookout at ihe stern of the Mastodon or at the stern of the El Vivo, at a position low enough to see an object in the river as small as the gas boat. The defendant company had a right to presume, and to rely upon the presumption, that no small craft without a bright light would come near the barge or tug at night.
[4] Our conclusion is that the fatal accident was not the result of any negligence on the part of the officers or crew of the Mastodon or the El Vivo. It is too well settled to require citation of authorities—too plain to admit of argument—that, under the provision of article 2315 of the Civil Code that every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it, there is no liability unless there has been some fault or negligence.
[5] We do not rest the decision of this case upon the doctrine of contributory negligence on the part of plaintiffs’ daughter, but upon the conclusion that there was no negligence on the part of the employés of the defendant company. If there was negligence on the part of the young men who were operating the gas boat, it was not attributable to plaintiffs’ daughter. One who travels as an invited guest in a boat or vehicle is not responsible for the negligence of the person who operates the boat or vehicle.
Defendant’s counsel cite the decision in Dixon v. Vicksburg, Shreveport & Pacific Railway Co., 139 La. 336, 71 South. 529, as maintaining that contributory negligence on the part of the driver of a vehicle is attributable to an invited guest in the vehicle. In the last paragraph of the decision, however, it was said to be unnecessary for the court to consider the- case from the point of view of negligence on the part of the plaintiff as a passenger in the vehicle. And this court has since said, in Broussard v. Louisiana Western Railroad Co., 140 La. 521, 73 South. 607, that what was said in Dixon v. V. S. & P. R. Co., “practically to the effect that a person on the front seat of an automobile is under the same legal obligation as the chauffeur to be observant,” was mere obiter dictum, “and as to its being good law in any case, qusere.” The obiter dictum in the Dixon Case was, in effect, overruled again in Jacobs v. Jacobs, 141 La. 272, 74 South. 992, L. R. A. 1917F, 253, and again in Maritzky, v. Shreveport Railways Co., 140 La. 692, 81 South. 253. It is of no importance, therefore, whether the young men in charge of the motorboat were or were not guilty of negligence, in their failure to comply -with the Act of Congress approved June 9, 1910, requiring such boats to be equipped with life preservers, *37 a whistle, and a combination lantern besides the bright light. What caused the fatal accident in this case was the stopping of the gas engine and the going out of the light on the gas boat, at a dangerous time and place. Those occurrences were probably not due to any one’s fault. It is sufficient to say, however, the defendant company was not at fault.
The judgment appealed from is affirmed, at appellants’ cost.
MONROE, C. J., takes no part.