In this suit plaintiff, Mrs. Mary Hays Tolle, individually and as natural tutrix of her minor daughter, Mary Ann Tolle, sues the Higgins Industries, Inc., Higgins Plastics, Inc., and the Maryland Casualty Company, the liability insurer of the Higgins Companies, for damages in the sum of $45,000 in her own behalf, and in the sum of $15,000 for the use and benefit of her minor daughter, for the death, by drowning, of her husband, Albert Elmer Tolle, on the afternoon of August 30, 1944, in Tickfaw River, at a point about 2 1/2 miles or less from Rome Ferry bridge, in the parish of Livingston.
For a cause of action, after alleging that Tickfaw River, emptying in Lake Maurepas, is a navigable stream, being habitually used by fishermen, both sportsmen and otherwise, occupying small boats propelled either by oars or by power furnished by stationary engine or outboard motor, and also being used by larger craft for ordinary purposes of commerce and after alleging that the owners, operators, captains, helmsmen, pilots, or other people, regardless of their capacity, who actually control the movement of the larger craft on said river used for commercial navigation, are well aware of the fact that the said river is used as aforesaid by fishermen using small boats propelled by oars or power as aforesaid, and it is the duty of the operators of such larger craft, whether they be termed captain, pilot, helmsman or otherwise, to use the necessary precaution in navigating said river in order to insure the safety of such smaller craft as habitually navigate the same, plaintiff alleges that on the afternoon of August 30, 1944, her husband, Albert E. Tolle, and Ray E. Ridnour, fishing companions for approximately fifteen years, went to Rome Ferry on Tickfaw River, and hired a small fishing craft to which they attached a 4 1/2 HP outboard motor to propel the craft in the course of their fishing, equipping the craft with usual safety appliances, including a life preserver in the bow which was occupied by Ridnour and a life preserver in the stern, which was occupied by her husband, who was operating the outboard motor and steering the fishing craft; that, after having fished for a while and after having reached a point about 2 1/2 miles below Rome Ferry, due to the unfavorable condition of the water for fishing, her husband and Ridnour decided to return to Rome Ferry and surrender the boat to its owner, and return to their homes; that after they turned and started back upstream towards Rome Ferry, they noticed coming down the river at a high rate of speed a barge loaded with logs and propelled by a towboat, sometimes known as a propeller, and noticed that, due to the high speed of the said towboat and barge, a large wash or swell was created by same; that Tolle steered the fishing boat into the wave or swell at right angle in order to properly ride the wave or swell, and at the same time he and his companion hailed the towboat operator to reduce his speed, but received no reply, no sign of recognition and no reduction of speed; that the wave or swell capsized the boat *Page 746 
occupied by Tolle and Ridnour throwing them both into the water; that Ridnour swam to safety, but Tolle, apparently dazed from being struck on the right temple by the boat when it capsized, sank and was drowned.
Plaintiff further alleges that the towboat, named the "Oxdozer," and the bargeload of logs were owned by the Higgins Industries, Inc., or the Higgins Plastics, Inc., and were in the use and under control of the employee or employees of the said corporations, and that the said Higgins' Corporations were interlocking corporations, thus being liable in solido for the death of her husband.
Plaintiff further alleges that, even after the said towboat and barge had passed the sunken craft formerly occupied by her husband, said towboat could have effected a rescue, but, instead of attempting so to do, the said towboat and barge continued at a high rate of speed down said river and toward Lake Maurepas.
Plaintiff alleges that Tolle and Ridnour were free from negligence in the operation of their boat and that the sole cause of the death of the said Tolle was the negligence of the operator of said towboat and barge in the following particulars: 1. In loading the logs on the barge to such a height that the operator of the towboat could not see over the top of said logs and could not see directly ahead or within four points off either bow. 2. By the failure to have a proper lookout posted on said barge in order to warn the pilot of any other craft which may have been endangered, either by collision or by wave or swell created by said craft. 3. The failure to hear, on the part of the operator of the towboat, the shouts of Tolle and Ridnour, or if he heard them, then the failure to heed them. 4. The failure on the part of the pilot of the towboat to assist Tolle in saving himself from drowning after his boat was capsized. 5. In operating the towboat at a speed which was excessive, especially in view of the knowledge of the operator of the towboat that small boats such as that occupied by Tolle and Ridnour were in the habit of navigating said river for fishing purposes and otherwise.
For answer, defendants denied all of the material allegations of plaintiff's petition, specifically the allegations of negligence on the part of themselves, their servants or agents. They specifically averred that if Tolle was drowned in Tickfaw River that it was solely due to his own negligence and not to any negligence on the part of the defendants or their servants or agents. In the alternative, they pleaded contributory negligence on the part of Tolle in not having his boat under control or in being careless and negligent in not watching the operations of their towboat, the "Oxdozer," and handling his boat so as to prevent it from being capsized by reason of the swell, or in not being properly seated in the boat at the time the "Oxdozer" passed.
The lower court rendered a judgment in favor of plaintiff, individually, for the sum of $17,000, and as natural tutrix for the use and benefit of her minor daughter, Mary Ann Tolle, for the sum of $9,000, against the defendants Higgins Industries, Inc., and Maryland Casualty Company, in solido. The named defendants have appealed. Plaintiff, individually and as natural tutrix, has answered the appeal by asking that the amounts awarded in the judgment of the lower court be increased to the amounts claimed in her petition.
As this case involves the alleged overturning of a small boat or craft by the alleged wave or swell of a towboat pushing a barge while passing each other in a navigable river, we do not find any cases in Louisiana adjudicating the respective duties of the crafts. Necessarily, we must look beyond this State to find any rule of law established by decisions of other states regarding the rule of law to be applicable to the case at bar.
[1] In American Jurisprudence, Vol. 48, page 189, Sec. 280, it is stated that: "The rule is recognized by both the admiralty and the common-law courts that a duty rests upon large, fast and powerful vessels not to travel upon navigable waters at such a speed as to produce displacement waves or suctions that will cause injury to other properly handled craft; and the liability of vessel and owner for damage resulting *Page 747 
from this source is well settled." This general statement of the rule has been recognized and applied in Louisiana in a few cases, most notably in the case of Salmen Brick Lbr. Co. v. Southern Pacific Co., 132 La. 356, 61 So. 401, wherein it was held that a vessel causing injury to others by her swell must be held responsible for any failure to appreciate the reasonable effect of her own speed and motion of the waters at the place of the accident. In the same section from which we have quoted, it is further stated that: "In case of damages to a small boat and its occupants from displacement waves of a steamer, persons in charge of the latter are bound to avoid the danger by ceasing the normal operation of their vessel and stopping the revolution of its paddle wheels or propeller until the smaller boat has passed without the zone of danger. * * * Under the principles just stated, vessels have been held liable for injury by displacement waves to a great variety of smaller craft, including scows, barges, canal boats, commercial sailing vessels of moderate proportions, and flat boats. The same rule has been held applicable to rowboats, where those in charge of a steamer had notice of the peril from his displacement waves,although some uncertainty has been expressed of the steamer'sgeneral duty to guard against the effect of her swells uponrowboats, in view of their ready mobility." (Italics ours.) The latter part of the statement quoted and tinder-scored by us is and should be a sound statement of the law" relative to the case at bar in that it is most plausible that a small boat such as a rowboat, either propelled by oars or outboard motor, is one which is very easily maneuvered when compared to a tug boat towing a barge, and it is much easier for those in charge of the rowboat to observe the duty of care and avoid the danger, especially more so when it is alleged and testified thereto that the occupants of the rowboat noticed, by the high rate of speed of the tug and barge approaching them, that a large wash or swell was being created.
[2] With our comments in mind as hereinabove stated, we find, in Corpus Juris, Vol. 58, in § 419, subsec. b, at page 300, the following: "Those in charge of a smaller or weaker vessel in a proper place have a right to assume that the larger vessel will observe reasonable precautions to avoid injuring her by reason of her swell or suction, and they are under no obligation to warn the larger vessel of the danger; but at the same time itis their duty to use all reasonable care and prudence to avoidthe effect of such known dangers, and the vessel causing thesuction or swell is liable only for such damages as are theproximate result of her negligence. * * * The passing vessel isnot to be considered an insurer of an inferior vessel." (Italics ours.)
[3] In all cases arising in tort in Louisiana, under Civil Code Article 2315, there must necessarily be fault or negligence on the part of the one allegedly causing the damage before there can be a recovery, even if the cause of action be one for the death of an occupant of a motorboat capsized by a vessel or tugboat. See Luke et ux. v. Morgan's Louisiana T. R. S. S. Co., 147 La. 30, 84 So. 483.
[4] In our case plaintiff bears the burden of proof to show fault or negligence on the part of the tugboat operator.
[5] In this case, plaintiff relies on five distinct charges of negligence set out supra. Charges Nos. 3 and 4 can be speedily and quickly disposed of in that plaintiff, either in oral argument or in brief does not lay any stress thereon. The evidence shows that on account of the noise of the running of the engine, the operator of the towboat could not hear the alleged shouts of Ridnour or of Tolle, nor did he see Tolle in the act of drowning. Therefore, there only remain three charges of negligence, namely, 1, 2 and 5, as stated supra.
[6] In order to hold the defendant liable in this case it was necessary for the lower court to assume that because the larger boat and barge passed the place where this accident occurred on the Tickfaw River during the same afternoon, and that one of the occupants of the rowboat who survived said that it capsized from the swell made by a larger boat, regardless of the rate of speed or the way in which the larger boat was being handled, or the distance it was *Page 748 
from the shore, the operators were negligent and therefore their employer should be held responsible for the loss of the life of the man who was drowned. To do so the Court had to rely exclusively on such assumption and on the statements made by the survivor, admittedly a close personal friend of the deceased and his family and who admits in his testimony that he and his deceased friend had been on the river on fishing trips just like on this afternoon, one hundred times before over a period of 17 years; that they had met such boats before and never experienced any trouble whatever in meeting the swells. That witness is Mr. Roy Ridnour who occupied a responsible position with the Louisiana Power Light Co., and who, as we analyze his statement, though he wanted to tell the truth at the time, was prompted by his friendship for the man with whom he had undergone such a trying experience, and by his sympathy for the widow and child to be as favorable as possible to their side of the case.
He says that on the afternoon of August 30, 1944, he and his friend had an appointment to go fishing on Tickfaw River. He had an outboard motor, four or five horsepower strong, which he carried with them to Rome Ferry where they rented a boat at that place. The boat was painted an orange color, was 14 ft. long and about 3 to 3 1/2 ft. wide, with a fish well in the center. The lilies were very bad and they tried fishing at two or three places, but it started to rain and they decided to go back at about 3:30 in the afternoon, coming upstream on the left (west) side of the bank, looking for a place to fish where he and Tolle had often fished, not less than a hundred times. At quite a distance, over a mile, he saw a lot of logs coming down the river, but could not see any boat either pulling or pushing the logs. As they got closer to each other, he was watching to see how that "thing" was coming down the river, as he could not see the pilot house. He then states that "the ideaoccurred to me that the pilot could not see straight out aheadand that he should have someone on front of the barge." (Italics ours.) As the barge drew up to them and they were about to pass each other he then could see that the "Oxdozer" boat was pushing the barge. That, he says, was when he waved at the boat to stop or slow down. There was no sign that anyone saw them, so he yelled loud. The boat had a powerful motor, which he could tell by the exhaust. Then he says "As we came just opposite the barge, we could see the swell from the boat and Mr. Tolle turned the boat out toward the center of the stream so as to cross the waves at right angle." The first wave came even with the edge of the boat, the second went over the edge and the third completely turned the boat upside down throwing them both out into the water. The lilies were very bad thirty feet from the bank. He screamed loud, but did not become excited until he saw what was happening to Tolle. Then he shouted as loud as he could.
On cross-examination he says they were about a quarter of a mile apart when he first noticed the speed at which the boat was coming. It was in the middle of the river. They were less than 100 feet from shore, probably 65 feet. Later on he says that there was a distance of some 150 feet between them when the two boats passed each other. He says that Tolle could have run the boat amongst the lilies, or could have run the boat in an open space between the lilies, as he did in swimming to a tree near the bank, instead of towards the center of the stream, and he imagines that the lilies would help to kill the swell. His idea is that they met the swells when they were just opposite the boat and he thinks they must have come from the barge. He is not sure about this, however, then he says: "It might have come from either or both. Frankly, I don't know." All this he claims happened when they were on the west side of the river and that really is the side on which Tolle's body was discovered late that night. Later on in his testimony he states that the Tolle boat was more than a hundred yards of meeting the tug and barge when he saw the wake in front of the barge and the waves caused thereby "looked bad," yet Tolle proceeded to drive his boat without a change of course in his traveling upstream.
Analyzing this testimony we find the witness' statement thatthe idea occurred to *Page 749 him, even before they had met the barge, that the pilot could not see straight ahead of him and that there should have been someone on the barge to direct him, to be a, bit remarkable. The strongest point of negligence in the plaintiff's case as we view it, arises out of the failure to have a lookout on the barge to direct the pilot and we wonder if the observations of this witness are not afterthoughts or prompted by some other motive that that statement would turn out to be very favorable to the plaintiff. But let us say for the sake of argument that he did have such an idea at the time, wouldn't all that indicate a rather strong warning to him or some sort of premonition on his part that there might be some danger lurking ahead with a boat running wild in the river at a speed which he considered excessive. Furthergiore, he was fully warned that the wake and waves or swell were bad, yet it didn't devolve upon him to prepare for such an emergency and warn his companion, who was running the outboard motor in their boat, to take proper steps to heed the danger. These warnings were visible to Tolle, as well as to him. Instead, it seems that they just waited for the boat and barge to meet them, and then, instead of turning toward shore, or turning to the lilies where he says himself he imagines the swells could be killed, his companion running the boat turned directly at a right angle toward the center of the stream into the swell itself. He admits Tolle could have maneuvered his boat in the open spaces between the lilies.
There is room for doubt in our mind, however, that all of these ideas occurred to the witness at the time because further on in his statement he says that he was not excited until he saw what was happening to Tolle. He does say that previously he had waved to the boat to slow down, but there again there seems to be a little contradiction on his part for if as he says, there was no one acting as a lookout to direct the maneuvers, to whom was he waving? Finally, analyzing his statement, it is impossible to say when and where they were in relation to the boat and barge when the swells overtook their boat. He seems to believe that they came from the barge, but that we can hardly understand as it strikes us that whatever swells or waves that are made by a boat in motion follow in the wake of the boat and do not appear on the side of a barge which it may be pushing ahead, especially a barge with a square front 28 fect in width, as the one in this case. Moreover, if we are to accept this witness' statement made later on that the barge was pushing a heavy load of water lilies ahead of it, it would seem to us that that made it still more difficult, if not impossible, for it to have created a swell of the force necessary to turn a boat over.
In his statement in chief the witness Ridnour does not say exactly what the speed of the boat was. Later on he expresses the idea that it was going about 15 miles an hour. Had it been going at that rate we would think that there was a chance for it to throw a big wave back of it which might disturb smaller craft in its path. But we do not believe that the witness intended to say this boat was going at that rate of speed and the testimony is otherwise overwhelming that its maximum speed is no more than 7 or 8 miles and that pushing a loaded barge as it was on that day, it could hardly make more than 5 or 6 miles an hour.
As we have said, it is on that testimony and on the fact that this boat did capsize and a man was drowned, and on that alone, that these defendants can be held responsible.
As against that there is the testimony of the three men who constituted the crew on the boat, one the captain, the other the deck hand and the third the cook, who all testified that this boat left the landing just below Rome Ferry that afternoon at about 3:00 o'clock pushing this barge loaded with 300 logs and that from the time it left until they reached Lake Maurepas that evening at 7:30 the boat was operated in the regular and customary manner with the deck hand serving as the lookout on top of the log pile directing the pilot of the boat who had to rely entirely on his signals to steer the craft. The rate of speed at which the said boat was going is practically verified by the time it took them to travel from the landing to the lake, a distance of about *Page 750 
21 or 22 miles, and that would check at just about 5 or 6 miles per hour. The deck hand frankly states that he did not see any boat or craft on the west side of, the river at about the point where this accident occurred but he says that he saw a boat painted an orange color occupied by two men, one of whom was standing with a flying rod in his hand and the other sitting, on the east side of the river and that they passed them, he saw no danger of anything happening to the boat because of any waves that might be created by their boat. The crew all stated that the boat held to the middle of the stream all the way down, that none of them heard any shouts or hailing, that they saw nothing happen at all on the river and never knew that there had been an accident until they reached Lake Maurepas that evening at about 7:30. The deck hand who was the lookout says that the only boat other than the one just mentioned was a small row fishing boat occupied by a man named Foster and another man and a boy which was coming out of the channel to Lake Maurepas. From his testimony it appears that they passed the boat within much closer range, some testimony being that it was only 10 feet away, and the waves had no more than the ordinary effect on it. This man Foster had previously testified that he was on the river in a boat that afternoon and had met the "Oxdozer" and barge, but had stated that he was from three to five hundred feet away from it. Naturally a difference of ten to three hundred feet would have made a difference as far as the effect of the waves was concerned, but it is shown later on that Foster was recalled to the stand, and while he stated that his boat was more than ten feet away, we get the impression that he did not mean to insist that he was as far as 300 feet away. In fact, he had given a previous statement in which he estimated the distance from fifty to one hundred feet, and even at 100 feet he would have been 50 feet closer than the witness Ridnour said their boat was from the "Oxdozer" at the time it was thrown over by the swells.
Under all the facts therefore, giving as much weight to the testimony of the defendant witness as we think we should to the testimony of the witness Ridnour, we are of the opinion that the plaintiff has failed to carry the burden of proof that rested on her to show that the death of Mr. Tolle was caused through any negligence or fault on the part of the operators and owners of this boat and barge. And even if there had been any negligence on their part and we are to adopt the principle of law to the effect that in cases of small crafts which can be handled more readily there is a greater duty on the part of the operators of that craft to guard against the danger of peril that becomes apparent, then we are firm in the opinion that this unfortunate man did not take proper heed to avoid the danger and that the accident was caused by his own fault and negligence as well.
In further connection with the principle as stated in relation to small craft there is an Annotation found in 5 L.R.A., N.S., at page 303. The case note which we find is a bit long, but at the same time we think so pertinent we take the liberty of quoting: "Relative Duty of Steamers and Small Crafts propelled by Oars on Rivers and in narrow Channels. In Fischer v. Camden P. S. B. Ferry Co., 124 Pa. 154, 16 A. 634, 635, the collision was on the Delaware River between a steam ferry boat and a rowboat. It was held that the rowboat is not a 'vessel' within the meaning of the rule which requires that 'every steam-vessel, when approaching another vessel, so as to involve risk of collision, shall slacken her speed, or, if necessary, stop or reverse.' The Court said: 'The meaning of this rule is that a steamer must keep out of the way of a sailing vessel, and the reason is that the steamer is more easily handled.' We must construe the word vessel as it is properly understood for such is the sense in which the law making power probably used it. When we speak of a rowboat we do not mean a 'vessel' as that term is generally understood. Nor does the reason of the rule apply to rowboats. Of all water craft they are the most easily handled. A few strokes of the oars in the hands of competent men will take a rowboat out of the path of an approaching steamer. The latter is confined to a *Page 751 
channel often narrow, whilst the rowboat requires but a few inches of water to float it. To apply the rule above quoted to such craft would be a palpable misapplication of it, and would wholly ignore the reason upon which it is founded."
In that same annotation the case of "The Missisquoi" is referred to and it is stated that it was there held that a small boat had time to get out of the way of the colliding steamer when the man in the small boat saw the steamer approaching him 200 to 300 feet away; and the libel which conceded the obligation of the small boat to get out of the way, was dismissed.
[7] The principle regarding the duty of the operator of smaller craft which is more easily maneuvered is the one which applies in this case, and whilst all references to it are found in older cases before the advent of the outboard motor, which is now so extensively used in powering a row boat, still we believe that the same principle applies, for, in our opinion, such boats can be as easily maneuvered and steered with such power as they can by the use of oars. Especially is this so in cases where they are handled by experienced men who, like the two men in the present case, had been indulging in these fishing parties in these same waters for 17 years and were very able and competent to handle all kinds of small boats.
For these reasons assigned, the judgment of the lower court is reversed, annulled and set aside. It is ordered that plaintiff's suit is dismissed at her costs in both courts.